**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| SHONDRA ROYAL, personal representative | ) | |
| of the Wrongful Death Estate of | ) | |
| LANCE EDWARD ROYAL, JR., | ) | |
|       Plaintiff, | ) | |
| | ) | |
|   v. | ) | CAUSE NO.: 1:17-CV-247-PRC |
| | ) | |
| CITY OF FORT WAYNE, CAMERON NORRIS, | ) | |
| JONATHAN BOWERS, KURT FRANCEUS, | ) | |
| JUAN GUTIERREZ, and SHANE HEATH, | ) | |
|       Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 29], filed

by Defendants City of Fort Wayne, Cameron Norris, Jonathan Bowers, Kurt Franceus, Juan

Gutierrez, and Shane Heath on June 5, 2018. Plaintiff Shondra Royal, personal representative of the

Wrongful Death Estate of Lance Edward Royal, Jr., filed a response on June 24, 2018, and

Defendants filed a reply on July 5, 2018. This matter is also before the Court on Defendants' Motion

to Strike "Plaintiff's Appendix: I. Local Rule 56-1 Statement of Genuine Issues" [DE 34], filed by

Defendants on July 5, 2018, and fully briefed as of July 10, 2018. For the reasons set forth below,

the Court grants in part and denies in part the Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

Plaintiff Shondra Royal, personal representative of the Wrongful Death Estate of Lance

Edward Royal, Jr., filed a Complaint in this Court on June 15, 2017, against Defendants City of Fort

Wayne, Detective Cameron Norris, Detective Sergeant Jonathan Bowers, Detective Kurt Franceus,

Detective Juan Gutierrez, and Detective Shane Heath. (Compl. ¶¶ 5,6). The officers are named in

their individual capacities, and Plaintiff alleges that they were acting under color of law for purposes

of the constitutional claims and within the scope of their employment for purposes of the Indiana state law tort claims. (Compl. ¶ 6). Plaintiff alleges that Defendants caused the death of Lance Edward Royal, Jr. through the denial of post-arrest medical care, bringing claims under 42 U.S.C. § 1983, the Indiana Wrongful Death Act, and Indiana state law for claims of assault and battery and of false imprisonment. (Compl. ¶¶ 1, 2). Defendants filed an Answer on July 11, 2017.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure require that a motion for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable jury could find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes

demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56 (a), (c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015). When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Spierer*, 798 F.3d at 507-08.

"Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(c)(1), (e); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764, 765 (7th Cir. 2014). A court's role is not to evaluate the weight of the evidence, judge the credibility of witnesses, or determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MOTION TO STRIKE

Defendants ask the Court to strike Plaintiff's Local Rule 56-1 Statement of Genuine Disputes, arguing that the Statement of Genuine Disputes as a whole is an impermissible extension

of Plaintiff's brief because it contains argument of counsel, analysis of exhibits, interpretations of video recordings, unfounded assertions, and citation to case law. Defendants also argue that the cited portions of Porshea Gentry's deposition testimony should be stricken because Ms. Gentry's testimony contradicts what is seen and heard on the video recordings. However, as noted by Plaintiff, Defendants have not identified any particular section, page, sentence, or word from Plaintiff's Statement of Genuine Disputes that they contend is improper.

The party opposing summary judgment—Plaintiff in this case—is required by local rule to file a "Statement of Genuine Disputes," either as part of the response brief or an appendix, that "identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." N.D. Ind. L.R. 56-1(b)(2). Plaintiff's Statement of Genuine Disputes does just that, identifying portions of Defendants' Affidavits, the four video recordings, and various other documents produced in discovery that Plaintiff contends demonstrate a material question of fact as to whether the defendant officers were on notice of Mr. Royal's serious medical need, whether it was objectively reasonable for the officers not to provide Mr. Royal with medical care, and whether the officers had been properly trained by the City of Fort Wayne.

As for Plaintiff's discussion of the video evidence, the Court has reviewed the video recordings and included in the facts below Plaintiff's description of the video recordings as supported by the cited portions of the video recordings. Defendants do not identify any inaccuracies in Plaintiff's descriptions or offer any alternate descriptions. It is not clear what other means Plaintiff has of identifying facts from a video for purposes of a Statement of Genuine Disputes. As for any argument, characterization, or citation to law that should have been included in the brief, the Court disregards those portions of the Statement of Genuine Issues.

Finally, the Court considers Defendants' request to strike Plaintiff's citation to Ms. Gentry's deposition on the basis that Ms. Gentry's testimony contradicts what is seen and heard on the video recordings. Defendants correctly note that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (discussing videotape evidence). However, Defendants do not explain how Ms. Gentry's deposition testimony is contradicted by the video recordings, nor do they identify the contradictory portions of the video recordings.

Based on the foregoing, the Court denies the Motion to Strike.

## MATERIAL FACTS

At approximately 11:04 a.m. on June 25, 2015, a traffic stop was conducted that led to the arrest of Lance Royal by City of Fort Wayne detectives. Detective Gutierrez conducted the traffic stop of the vehicle Mr. Royal was driving to arrest the passenger, Porshea Gentry, for whom an active arrest warrant had been issued related to an on-going narcotics investigation. At the time he was removed from the car, Mr. Royal was chewing cocaine, which the detectives ordered him to spit out; an additional quantity of cocaine was recovered from the car. Ms. Gentry, the passenger, was transported to the hospital from the scene of the traffic stop. Mr. Royal was transported directly to an interview room at the Fort Wayne police operations center, arriving at approximately 11:48 a.m. After being found on the floor having what appeared to be a seizure, Mr. Royal was taken from the interview room at 12:32 p.m. to receive medical care but died from a cocaine overdose while in custody. The five defendant officers were involved to varying degrees in the traffic stop and Mr. Royal's arrest and detention.

1. *Detective Juan Carlos Gutierrez*

On December 15, 2003, Detective Juan Carlos Gutierrez became a police officer for the City of Fort Wayne. (ECF 29-1, ¶ 2). On May 21, 2018, the date of his Affidavit, Detective Gutierrez held the position of Detective Vice and Narcotics. *Id*. In his Affidavit, Detective Gutierrez provides the following information.

On June 25, 2015, Detective Gutierrez was on duty as a detective for the Fort Wayne Police Department, wearing a full police uniform and driving a fully-marked police car. *Id*. at ¶ 3. At approximately 11:04 a.m., Detective Gutierrez conducted a traffic stop on a 2007 red Dodge Charger at 8200 Bridgeway Drive in Fort Wayne, Indiana, related to an on-going narcotics investigation. *Id*. at ¶ 4. Detective Gutierrez went to the passenger side of the vehicle based on information that the target suspect, Porshea Gentry, was in the passenger seat. *Id*. at ¶ 5. He approached the vehicle, opened the door, and took Ms. Gentry out of the vehicle. *Id*. at ¶ 6. Detective Shane Heath approached and helped handcuff Ms. Gentry outside the vehicle. *Id*. at ¶ 7. Once handcuffed, Ms. Gentry was escorted by Detective Gutierrez to the back seat of his squad car. *Id*. at ¶ 8.

Detective Cameron Norris removed the driver, later identified as Mr. Royal, from the vehicle. *Id*. at ¶ 9. Mr. Royal was put on the ground and was then escorted behind Detective Gutierrez's squad car. *Id*. at ¶ 10. Detective Gutierrez states that Mr. Royal appeared to be chewing something, and Detective Gutierrez could hear Detective Norris telling Mr. Royal to "spit it out." *Id*. Detective Gutierrez took two pictures of Mr. Royal's face. *Id*.

Fort Wayne police officer Alisha Smith was contacted to conduct a pat down search of Ms. Gentry. *Id*. at ¶ 11. When Ms. Gentry stated that she did not feel well, Detective Gutierrez opened

the door to his squad car and allowed Ms. Gentry's feet to come out to the pavement; Ms. Gentry started spitting. *Id*. at ¶ 12. Detective Gutierrez and Sergeant Jon Bowers called the paramedics. *Id*.

When the paramedics arrived, Detective Gutierrez told them that Ms. Gentry was feeling nauseous and that Mr. Royal had been chewing something. *Id*. at ¶ 13. The paramedics spoke to both Ms. Gentry and Mr. Royal and decided to transport Ms. Gentry to the hospital. *Id*. at ¶ 14. Detective Gutierrez never had any physical contact with Mr. Royal. *Id*. at ¶ 15. Detective Gutierrez processed the scene and took photographs; the incident was captured on his in-car camera under Control No. 15F080727. *Id*. at ¶¶ 16-17; *see also* (Def. Ex. F).

2.     *Detective Cameron Norris*

Detective Cameron Norris became a police officer for the City of Fort Wayne on August 27, 2010, and on May 24, 2018, he held the position of Vice and Narcotics Detective. (ECF 29-2, ¶ 2). Detective Norris provides the following information in his affidavit.

On June 25, 2015, Detective Norris was an undercover Vice and Narcotics Detective, was on duty, and was involved in a narcotics investigation. *Id*. at ¶¶ 3-4. Detective Heath was conducting surveillance in the area of 8616 Lakeside Drive, Fort Wayne, Indiana, when Detective Heath saw the suspect—Ms. Gentry— and a male exit the apartment where Ms. Gentry was known to stay and get into a red Dodge Charger. *Id*. at ¶ 4. Detective Norris responded to the area to assist with the surveillance. *Id*. at ¶ 5. Detective Norris then heard that Detective Gutierrez was conducting a traffic stop in the 8200 block of Bridgeway Drive. *Id*. at ¶ 6. Detective Norris drove to the traffic stop where he observed Detective Gutierrez exit his vehicle, approach the passenger side of the red Dodge Charger, and attempt to remove the female passenger believed to be Ms. Gentry. *Id*. at ¶ 7. Detective Norris observed Ms. Gentry struggle with Detective Gutierrez; he put the information

"over the air" that Detective Gutierrez was struggling with a female on the passenger side of the vehicle. *Id*.

Detective Norris then put on his Fort Wayne Police Department narcotics vest with identifiers and approached the driver's side of the vehicle. *Id*. at ¶ 8. Detective Norris had his weapon at the low ready position and observed a male driver, later identified as Mr. Royal, digging in his pocket or the center console area of the vehicle. *Id*. at ¶ 9. Detective Norris opened the driver's side door and removed Mr. Royal by his left arm and put him in the prone position on the ground. *Id*. at ¶ 10. As he was putting Mr. Royal on the ground, Detective Norris observed Mr. Royal chewing and observed a white powder and rock-like substance on Mr. Royal's face. *Id*. Detective Norris repeatedly yelled at Mr. Royal, "Spit it out, spit it out." *Id*. at ¶ 11. Detective Norris held Mr. Royal's jaw to prevent him from chewing or swallowing any contraband. *Id*. Detective Norris states that Mr. Royal was struggling with him and at one point Detective Norris' finger was in Mr. Royal's mouth. *Id*. at ¶ 12. A short time later, Sergeant John Bowers approached *Id*. Mr. Royal spit out a little bit of crack cocaine but was still chewing. *Id*. Both Sergeant Bowers and Detective Norris yelled at Mr. Royal to "Spit it out." *Id*. Mr. Royal began to spit out small pieces of crack cocaine. *Id*.

Detective Norris asked Mr. Royal how much he had eaten or chewed and Mr. Royal replied, "Just a pill." *Id*. at ¶ 13. Sergeant Bowers and Detective Norris helped Mr. Royal to his feet and walked him back to the trunk area of Detective Gutierrez's patrol car. *Id*. Detective Norris told Mr. Royal to open his mouth and stick out his tongue. *Id*. at ¶ 14. Sergeant Bowers and Detective Norris told Mr. Royal to tell them if he swallowed anything and that, if he had, it would not affect the criminal charges. *Id*. They told Mr. Royal that they were worried about his health and that they did

not want him to have a heart attack. *Id*. Mr. Royal stated that he was okay and that he did not swallow anything. *Id*. at ¶ 15. To Detective Norris, Mr. Royal did not appear concerned with having eaten or swallowed any narcotics. *Id*. The paramedics were called to the scene to examine Ms. Gentry; while at the scene, the paramedics "checked out" Mr. Royal and determined that he did not need to be transported to the hospital. *Id*. at ¶ 16.

3.    *Sergeant Jonathan Bowers*

On August 26, 1994, Jonathan Bowers became a police officer for the City of Fort Wayne. (ECF 29-3, ¶ 2). On November 8, 2010, he was promoted to Sergeant, and, on August 11, 2017, he was promoted to Lieutenant. *Id*. at ¶ 2. On June 25, 2015, he was a Sergeant Vice and Narcotics and worked in an undercover capacity. *Id*. at ¶ 3. For purposes of this motion, the Court will refer to him as Sergeant Bowers. Sergeant Bowers provides the following information in his affidavit.

On June 25, 2015, Sergeant Bowers was involved in an ongoing narcotics investigation. *Id*. at ¶ 4. He went to 8616 Lakeside Drive where the target of the investigation, Ms. Gentry, was known to stay. *Id*. While conducting surveillance on a white Caprice sitting outside the address, Sergeant Bowers was advised by Detective Heath that Ms. Gentry exited 8616 Lakeside Drive and got into the passenger side of a red Dodge Charger and that a male got into the driver's side of the vehicle. *Id*. at ¶¶ 5-6. The Dodge Charger began traveling through the apartment complex to leave; Sergeant Bowers spoke to case agent Detective Tina Blackburn who advised that the vehicle was known to be involved with Ms. Gentry. *Id*. at ¶ 7. Detective Gutierrez conducted a traffic stop of the vehicle, and Detective Heath, Detective Norris, Detective Kurt Franceus, and Sergeant Bowers drove to the traffic stop as backup. *Id*. at ¶ 8. Sergeant Bowers activated his body camera en route. *Id*. at ¶ 9.

As he arrived, Sergeant Bowers observed Detectives Gutierrez and Heath taking a female believed to be Ms. Gentry into custody on the passenger side of the vehicle. *Id*. at ¶ 10. Sergeant Bowers observed Detective Norris in the process of detaining the driver, later identified as Mr. Royal, on the driver's side. *Id*. at ¶ 11. As Sergeant Bowers approached the driver's side of the vehicle, he heard Detective Norris stating repeatedly to Mr. Royal, "Spit it out." *Id*. at ¶ 12.

Mr. Royal was in a prone position. *Id*. at ¶ 13. A short time later, Sergeant Bowers saw a small amount of what he believed to be crack cocaine lying on the ground by Mr. Royal's mouth. *Id*. Sergeant Bowers assisted with handcuffing Mr. Royal, helping Mr. Royal to his feet, and escorting Mr. Royal back to the trunk area of Detective Gutierrez's patrol car. *Id*. Mr. Royal told Sergeant Bowers, "I just ate a little pill." *Id*. While at the rear of the vehicle, Detective Norris and Sergeant Bowers told Mr. Royal that if he was still chewing anything to spit it out and it would not affect his criminal charges. *Id*. at ¶ 14. Both Detective Norris and Sergeant Bowers advised Mr. Royal that they were not looking to add criminal charges, that they were concerned about his health, to let them know if he swallowed anything, and that they did not want him to have a heart attack. *Id*.

When Detective Gutierrez reported that Ms. Gentry said she felt sick, Sergeant Bowers told Detective Gutierrez to open his patrol car door and to call the EMS. *Id*. at ¶ 15. A short time later, the EMS arrived, and the paramedics advised that they were going to transport Ms. Gentry to Parkview Hospital as a precaution. *Id*. at ¶ 16. At the scene, Sergeant Bowers asked the paramedics to talk to Mr. Royal because Mr. Royal was chewing something earlier. *Id*. at ¶ 17. Mr. Royal gave the paramedics the indication that he did not swallow anything and that there were no problems. *Id*.

The paramedics decided that Mr. Royal did not need to be transported. *Id.* Officer Smith arrived at the scene to assist with the pat down of Ms. Gentry and rode to the hospital with Ms. Gentry. *Id.*

Sergeant Bowers observed a small amount of cocaine in the red Dodge Charger on the driver's side and a heavy amount of powder and crack cocaine residue and debris on the passenger side. *Id.* at ¶ 19. Sergeant Bowers believed that Mr. Royal may have put cocaine in his mouth but believed that Mr. Royal spit it all out at the traffic stop because they recovered one to one and a half grams of crack cocaine that he had spit out. *Id.* at ¶ 20. Sergeant Bowers' body camera recorded the incident under Control No. 15F080727. *Id.* at ¶ 21; *see also* (Def. Ex. G).

### 4.     *Detective Shane Heath*

Detective Shane Heath was a police officer with the Auburn police department from November 2000 to March 2009 and became a police officer for the City of Fort Wayne on March 16, 2009. (ECF 29-4, ¶ 2). In his affidavit, Detective Heath provides the following information.

On June 25, 2015, Detective Heath was on duty for the Fort Wayne Police Department Vice and Narcotics Division, wearing plain clothes and working in an undercover capacity. *Id.* at ¶ 3. At approximately 10:00 a.m., Detective Blackburn had been briefing narcotic detectives, including Detective Heath, about a search warrant that she was serving at 3530 Oliver Street in Fort Wayne, Indiana. *Id.* at ¶ 4. Detective Blackburn showed a picture of her main suspect, Ms. Gentry, and "advised that she had charges of dealing cocaine on [Ms. Gentry]." *Id.* at ¶ 5. Detective Norris, who was then sent to the house prior to the execution of the search warrant, advised that he did not see any vehicles or movement at the residence. *Id.* at ¶ 6. Detective Blackburn told Detective Heath that Ms. Gentry typically drives a white Chevrolet Caprice and sometimes stays with a boyfriend at Southbridge Apartments. *Id.* at ¶ 7. Detective Blackburn asked Detective Heath to drive his

undercover vehicle to the area and attempt to locate the white Chevrolet Caprice. *Id*. at ¶ 8. Detective Heath located the white Chevrolet Caprice parked in front of the 8616 building. *Id*. at ¶ 9.

Detective Heath parked in the area and maintained visual continuity of the vehicle. *Id*. at ¶ 10. While watching the vehicle, Detective Heath was notified over the radio that the search warrant was served at 3530 Oliver Street, Ms. Gentry was not at the residence, and there were several individuals in the area of the warrant service who might alert Ms. Gentry. *Id*. at ¶¶ 10-11. Detective Heath observed a male come out of the 8616 building, look around, walk around the corner of the building out of view, and then walk back into the 8616 building. *Id*. at ¶ 12. Detective Blackburn asked Detective Heath, over the radio, if there was a red Dodge Charger parked in front of the apartment building, and Detective Heath reported a red Dodge Charger parked next to the white Chevrolet Caprice. *Id*. at ¶ 13. Detective Blackburn advised Detective Heath that the red Dodge Charger possibly belonged to Ms. Gentry's boyfriend. *Id*. at ¶ 14. A short time later, the male subject walked out of the 8616 building with Ms. Gentry, who appeared to be in a hurry and was looking around. *Id*. at ¶¶ 15, 16. Both subjects got into the red Dodge Charger, with Ms. Gentry in the front passenger seat and the male, later identified as Mr. Royal, in the driver's seat. *Id*. at ¶¶ 16-17.

Detective Heath alerted the other detectives in the area that the red Dodge Charger was leaving. *Id*. at ¶ 18. Detective Gutierrez advised that the red Dodge Charger just passed him; Detective Heath pulled out to follow the vehicle but did not see it. *Id*. at ¶ 19. Detective Heath attempted to locate the red Dodge Charger. *Id*. at ¶ 20. Detective Norris advised that Detective Gutierrez was struggling to place a female into custody. *Id*. Detective Heath arrived at the traffic stop and observed Detective Norris approaching the driver's side of the red Dodge Charger. *Id*. at

¶ 21. Detective Heath went to the passenger side of the vehicle and assisted Detective Gutierrez with handcuffing Ms. Gentry. *Id*. at ¶ 22. Once Ms. Gentry and Mr. Royal were properly secured in handcuffs, they were removed from the immediate area of the red Dodge Charger. *Id*. at ¶ 23. Detective Gutierrez alerted Detective Heath to the fact that there was cocaine all over the vehicle and even some lying outside of the vehicle. *Id*. Detective Gutierrez stated that he observed Ms. Gentry attempting to ingest the cocaine. *Id*.

Detective Heath assumed responsibility for photographing and collecting the evidence. *Id*. at ¶ 24. He recovered approximately 7.2 grams of cocaine in the red Dodge Charger that he placed in continuity. *Id*. at ¶¶ 25-28. He located this cocaine in a knotted clear plastic baggy underneath the passenger side of the vehicle (1.7 grams of cocaine HCL), off the passenger floorboard (3.1 grams of cocaine base), on the front passenger floor jam (1.1 grams of cocaine HCL), and in a knotted clear plastic baggy on the passenger floorboard (1.3 grams of cocaine base). *Id*. He located five empty knotted plastic baggies and a piece of Brillo on the front passenger seat and floorboard. *Id*. at ¶ 29. He also located mail addressed to Ms. Gentry, cell phones, a digital scale, and $1447.00 in U.S. currency in the red Dodge Charger. *Id*. at ¶¶ 30-36. Detective Heath used cocaine wipes on both of the front seats in the vehicle and on the floorboards on both sides of the vehicle; all areas field tested positive for the presence of cocaine. *Id*. at ¶ 43. Detectives Franceus and Norris located an off-white chunky substance that was in Mr. Royal's mouth; the substance field tested positive for cocaine base and had a substance weight of .4 grams. *Id*. at ¶ 38. Detective Heath transported all of the items from the traffic stop to the Fort Wayne Police Department Vice and Narcotics Division where he properly logged and placed all items in continuity. *Id*. at ¶ 45.

While processing the vehicle, Detective Heath observed paramedics arrive on the scene, but he did not have any conversation with the paramedics, Mr. Royal, or Ms. Gentry; he observed the medics remove and transport Ms. Gentry from the scene. *Id*. at ¶ 44. Detective Heath did not have any contact with Mr. Royal during this investigation and did not have any contact with Ms. Gentry after helping Detective Gutierrez put her in handcuffs. *Id*. at ¶ 46.

5.    *Detective Kurt Franceus*

Detective Kurt Franceus became a police officer for the City of Fort Wayne on October 26, 2007. (ECF 29-5, ¶ 2). In June 2009, Detective Franceus was assigned to the Vice and Narcotics division, and on June 25, 2015, he was a uniformed Vice and Narcotics Detective. *Id*. at ¶¶ 2-3. Detective Franceus provides the following information in his affidavit.

On June 25, 2015, Detective Franceus was aware that Vice and Narcotics detectives were conducting surveillance at 8600 Lakeside Drive and watching a white Caprice Classic used by the primary suspect, Ms. Gentry, who he was told had two counts of dealing cocaine pending. *Id*. at ¶ 4. Detective Franceus was informed that Detective Heath had observed the white Caprice Classic at 8600 Lakeside Drive and had been given information for a red Dodge Charger. *Id*. at ¶ 5. A short time later, Detective Franceus was advised via police radio that Ms. Gentry had exited the apartment building on Lakeside Drive and was walking to the red Dodge Charger. *Id*. at ¶ 6. At that time, Detective Franceus was at the apartment complex office gathering information to determine who lived at 8616 Lakeside Drive and determined that it was Mr. Royal. *Id*. at ¶ 7.

Detective Gutierrez conducted a traffic stop of the red Dodge Charger in the 8200 block of Bridgeway Drive. *Id*. at ¶ 8. Detective Franceus then received radio traffic from Detective Heath that Ms. Gentry was in the front passenger seat of the red Dodge Charger and the car was being driven

14

by a male. *Id*. Detective Franceus drove to the traffic stop where he could see Detective Norris and Sergeant Bowers taking the driver, later identified as Mr. Royal, into custody on the driver's side and Detectives Gutierrez and Heath taking Ms. Gentry into custody on the passenger side. *Id*. at ¶ 9.

As Detective Franceus approached the vehicle, he heard Sergeant Bowers yelling, "Spit it out, spit it out." *Id*. at ¶ 10. Detective Franceus observed Mr. Royal being handcuffed and spitting out what Detective Franceus believed to be cocaine. *Id*. Detective Norris and Sergeant Bowers escorted Mr. Royal behind Detective Gutierrez's squad car and again talked to him about spitting out anything in his mouth. *Id*. at ¶ 11. Detective Franceus photographed what appeared to be cocaine that Mr. Royal spit out. *Id*. at ¶ 12. Sergeant Bowers walked Mr. Royal to Detective Franceus' squad car and placed him in the back seat. *Id*. at ¶ 13. Detective Franceus picked up the cocaine that Mr. Royal spit out, put the cocaine in an evidence bag, and gave the bag to Detective Heath. *Id*. at ¶ 14.

The EMS was called for Ms. Gentry because she was nauseous. *Id*. at ¶ 15. When the paramedics arrived, they spoke to Ms. Gentry and advised that they were going to transport her to the hospital as a precautionary measure. *Id*. Sergeant Bowers asked the paramedics if they wanted to talk to Mr. Royal, telling the paramedics that Mr. Royal had been chewing some "rock." *Id*. at ¶ 16. Detective Franceus went back to his patrol car and opened the back door so the paramedics could check on Mr. Royal. *Id*. at ¶ 17. The paramedics asked Mr. Royal, "You alright?" *Id*. Mr. Royal replied, "Yeah." *Id*. The paramedics asked again, "You alright?" *Id*. Mr. Royal again replied, "Yeah." *Id*. The paramedics said, "Are you sure?" *Id*. Mr. Royal replied "positive." Mr. Royal informed the paramedics that he did not ingest any of the narcotics. *Id*.

Detective Franceus overheard Mr. Royal state to the paramedics, "It was just two rock." *Id.* at ¶ 18. Detective Franceus did not believe that Mr. Royal had swallowed any narcotics because, from his training and experience, after hearing Mr. Royal say "two rocks," Detective Franceus remembered retrieving the crack cocaine from the ground outside the driver's side of the car. *Id.* at ¶ 18. It appeared to be two pieces of a rock-like substance believed to be cocaine. *Id.* In addition, Mr. Royal was acting fine, and he did not express any concerns about his health. *Id.*

Detective Franceus believed that there was probable cause to arrest Mr. Royal for driving without a driver's license, possession of cocaine, and resisting law enforcement. *Id.* at ¶ 19. While transporting Mr. Royal in his squad car to the police operations center for an interview, Detective Franceus learned that Mr. Royal may have also violated his federal probation. *Id.* at ¶ 20. During the transport, Detective Franceus carried on a conversation with Mr. Royal. *Id.* Detective Franceus asked Mr. Royal, "How are you feeling?" *Id.* at ¶ 21. Mr. Royal replied, "I'm feeling fine." *Id.* Detective Franceus asked Mr. Royal, "Did you swallow any or did you spit it all out?" *Id.* at ¶ 21. Mr. Royal told Detective Franceus, "I spit it out." *Id.* Detective Franceus stated, "I just don't want you getting sick on me man." *Id.* Mr. Royal stated, "Yeah I will be fine." *Id.* There was no indication that Mr. Royal was having any medical issues. *Id.*

Detective Franceus drove the patrol car to the lower level of the police operations center and then walked Mr. Royal to the prisoner transport elevator and to interview room number eight. *Id.* at ¶ 22. Mr. Royal had no trouble walking and seemed completely fine. *Id.* Detective Franceus did a pat down search of Mr. Royal, exited the interview room, started the video recording of the interview room, and went to the Vice and Narcotics office, which is down the hall from the interview room. *Id.* at ¶¶ 23, 24. Earlier, Detective Franceus had received a phone call from the

federal probation office about Mr. Royal, and Detective Franceus planned on returning the call. *Id*. He worked with Detective Blackburn to prepare the search warrant for 8616 Apartment 1A, Lakeside Drive. *Id*.

Detective Franceus typed the search warrant application on one computer, and, on the computer desk directly adjacent, Detective Franceus used the iRecord system to monitor the interview room where Mr. Royal was located. *Id*. at ¶ 25. Detective Franceus observed Mr. Royal leaning over the table at one point. *Id*. at ¶ 26. Detective Franceus went to the interview room and asked Mr. Royal if everything was okay, to which Mr. Royal stated, "Yes, everything is okay." *Id*. At one point, Mr. Royal asked for a cup of coffee. *Id*. at ¶ 27. Detective Franceus stated that he could not give him a cup of coffee but brought him a bottle of water. *Id*. Detective Franceus asked Mr. Royal if he was okay, and Mr. Royal stated, "I am okay." *Id*. at ¶ 28. Detective Franceus asked Mr. Royal if he was certain and Mr. Royal stated, "Yes, perfect." *Id*. During the interaction with Mr. Royal in the interview room, Mr. Royal appeared to be normal and calm and there was nothing about his behavior or appearance that indicated that he was having any type of medical issue. *Id*. at ¶ 29.

Detective Franceus then went back to the Vice and Narcotics office and began working on the search warrant application and looking at the charging information. *Id*. at ¶ 30. A short time later, Detective Franceus walked back to the interview room because he was going to transport Mr. Royal to the Allen County lock-up for drug charges and driving charges. *Id.* Detective Franceus turned around and went back to his desk to obtain the telephone number for the federal probation office; he then received a phone call from the federal probation office and discussed Mr. Royal on his cell phone as he walked back to the interview room area. *Id*. When he arrived in the hallway of the interview room area, he heard what he believed to be a chair hitting a wall in the interview room

where Mr. Royal was located. *Id*. at ¶ 31. Detective Franceus walked into the video viewing room and saw on the monitor that Mr. Royal was lying on the floor; Detective Franceus did not believe anything was wrong because numerous other individuals who had become tired or bored would lie down on the interview room floor. *Id*. at ¶ 32.

Detective Franceus finished the call with the federal probation office, went to the interview room, and noticed at this time that Mr. Royal appeared to be having a seizure. *Id*. at ¶ 33. Detective Franceus got on the police radio and called for an ambulance and for EMS to come to the interview room. *Id*. at ¶ 34. He then rolled Mr. Royal onto his side in what is commonly known as the recovery position and noticed that Mr. Royal was foaming at the mouth. *Id*. Detective Franceus patted and rubbed Mr. Royal's back. *Id*. It appeared that the seizure activity was becoming more intense and that Mr. Royal was breathing heavily. *Id*. at ¶ 35. He radioed for the status of the ambulance, requested that detectives on the second floor come and assist him, and advised that he was going to start CPR. *Id*. Detective Franceus moved Mr. Royal into the hallway to start CPR, immediately beginning chest compressions until relieved by the EMS and fire department. *Id*. at ¶ 36. During this time, other officers and detectives assisted by holding the elevator for the paramedics and providing escorts for the ambulance to the hospital. *Id*. at ¶ 37. Detective Franceus rode to St. Joseph Hospital in the back of the ambulance with Mr. Royal and stood by while the physicians worked on Mr. Royal until they declared Mr. Royal deceased. *Id*. at ¶ 38.

The traffic stop and the transport to the police operations center were recorded on Detective Franceus' in-car camera under Control No. 15F080727. *Id*. at ¶ 39; (Def. Ex. H). The Fort Wayne Police Department interview room with Mr. Royal in it on June 25, 2015, was recorded on video. (ECF 29-5, ¶ 40); (Def. Ex. I).

6.      *Photographic and Video Evidence*

Detective Gutierrez took a photograph of Mr. Royal at the traffic stop on June 25, 2015. (ECF 31-1) (Pl. Ex. 1). The photograph shows white flecks on Mr. Royal's lips, around his mouth, in his moustache, and on his right cheek. *Id*.

In support of the Motion for Summary Judgment, Defendants submitted four video recordings of the June 25, 2015 events. *See* (ECF 28) (Def. Exs. F, G, H, I). The following portions of the video recordings are identified by Plaintiff in the Statement of Genuine Disputes and have been reviewed by the Court.

a.      Detective Gutierrez's In-Car Camera Video (Def. Ex. F)

The first two minutes and twenty seconds of this video of the traffic stop show Detective Gutierrez following a red Dodge Charger, stopping the vehicle, and removing the passenger, later identified as Ms. Gentry, from the vehicle. *See* (ECF 28) (Def. Ex. F, time 0:00 - 2:17). Approximately forty seconds pass from the time Officer Gutierrez stops the vehicle and when he approaches the passenger side of the vehicle. (1:25 - 2:05). Approximately one minute passes from the time Detective Gutierrez stops the vehicle and when Detective Norris opens the driver's side door to remove Mr. Royal from the vehicle. (1:25-2:27). A third and fourth officer, later identified as Detective Heath and Sergeant Bowers, arrive shortly after Detective Norris. (2:31 - 2:44). The video shows Detective Norris putting Mr. Royal face down on the ground. (2:35). At approximately the third minute, a fifth detective, later identified as Detective Franceus, arrives. (2:55).

Beginning just before the 5-minute mark, two officers who are with Mr. Royal at the back of Detective Gutierrez's car can be heard telling Mr. Royal to open his mouth and stick out his tongue, warning Mr. Royal that he is going to get sick, and stating that it won't affect his charge.

(4:51-5:10). It also sounds like an officer says either "you've got it all over" or "he's got it all over." (4:56). At approximately minute 8:20 an officer says, "Oh, I know Lance Royal." (8:18-8:24).

At minute 10:50, Detective Gutierrez says to the officers, "When I came in [the car], cocaine was flying everywhere." (10:47-10:57). A minute later, Detective Gutierrez warns a female police officer arriving at the scene, "Be careful, because there is cocaine everywhere."(11:45-11:50). At minute 16:50, Detective Gutierrez tells the arriving paramedics that "she" is the "one who felt nauseous;" that "there was a whole bunch of cocaine everywhere," gesturing to the red Dodge Charger as they walked past it, that the guy "was chewing the stuff," and that he did not know what she swallowed. (16:50-17:10). In telling Detective Franceus about the stop, Detective Gutierrez says, "There was cocaine everywhere." (18:30-18:35). At minute 25, officers are heard talking about which hospital can "clear" Ms. Gentry. (25:35-26:00). Then the paramedics are seen walking Ms. Gentry on a stretcher to the ambulance. At minute 39:10, Detective Gutierrez, Detective Norris, and Sergeant Bowers are standing at the driver's side door of the Dodge Charger while Detective Heath is standing at the rear passenger side of the trunk; Detective Gutierrez appears to be talking about the ability of Mr. Royal and Ms. Gentry to drive the car, using the phrase "all coked out" while gesturing his arms. (39:10-39:20).

At minute 43, Detective Gutierrez says they are doing a general inventory because there was too much cocaine in the front inside of the vehicle. (43:15). Several minutes later, Detective Gutierrez tells the tow truck driver who is towing the red Dodge Charger to tell his "guys not to go in" the vehicle because there are razor blades and cocaine in the vehicle. (46:00 - 46:18).

b.       Sergeant Bowers' Body Camera Video (Def. Ex. G)

There are two video recordings from Sergeant Bowers' body camera. In the first two minutes of the first recording, Sergeant Bowers is seen driving, then arriving at the scene, and then exiting his vehicle at minute 2:10. (ECF 28) (Def. Ex. G, 2:10). Sergeant Bowers approaches Detective Norris who has Mr. Royal on the ground face down, and Detective Norris can be heard repeatedly saying, "Spit it out." *Id.* (2:10-2:45). Mr. Royal can be heard eventually saying, "It's a pill." *Id.* (2:33). Detective Norris continues to say, "Spit it out." (2:33-2:41). It sounds as if Mr. Royal again says, "It's a pill." (2:41). To which Detective Norris responds, "No, it's not," and Detective Norris continues to tell him to "spit it out." (2:41-3:00). Detective Norris says, "Keep spitting it" and "Big spit." (2:57 - 3:12).

At minute 3, it sounds as if Sergeant Bowers tells Mr. Royal, "You don't want that cardiac event anyway." (3:07-3:09). Detective Norris says, "We don't want you to have a heart attack here, bud." (3:08-3:11). At minute 4:30, when Sergeant Bowers and Detective Norris are with Mr. Royal, one of the officers says, "He's still eating." (4:30). It sounds as if Detective Norris says, "Don't swallow more." (4:38-4:40). At minute 4:57, it sounds as if Sergeant Bowers says to Mr. Royal that he is "worried about your health," that he is "worried about you," and that "people have heart attacks." (4:57, 5:04, 5:05). At minute 9:30, Mr. Royal is placed in Detective Franceus' police vehicle. *Id.* (9:15-9:35).

In the second recording, which begins as the paramedics arrive, Sergeant Bowers is speaking with the paramedics about transporting Ms. Gentry to the hospital. *Id.* (2:58-3:10). Sergeant Bowers asks the paramedics if they want to talk to Mr. Royal to determine if they need to take him to the

hospital, stating, "I don't think you do." (3:12-3:15). At minute 4:50, Sergeant Bowers says that Ms. Gentry "ingested a bunch of dope." (4:50).

      c.      Detective Franceus' In-Car Camera Video (Def. Ex. H).

Detective Franceus' in-car camera video of the June 25, 2015 arrest shows Mr. Royal confined in the back of Detective Franceus' vehicle. (ECF 28) (Def. Ex. H). At the one minute mark, Detective Franceus enters the vehicle and is heard saying to Mr. Royal, ". . . you can't figure out what the problem is, then you got bigger problems." *Id*. (1:05-1:08). Detective Franceus then exits his vehicle and tells another officer that he said that to Mr. Royal. The officers laugh. (1:30-1:37). At minute 2:15, Detectives Gutierrez and Franceus discuss Detective Gutierrez following the vehicle before the stop and why Detective Gutierrez decided to make the vehicle stop, and Detective Franceus can be heard saying, "That's probably better because they were eating it probably while you were following them." (2:14-2:17). Detective Gutierrez tells Detective Franceus that when he approached the vehicle, "there was cocaine everywhere." (2:22-2:26).

Several minutes later, the paramedics speak briefly with Mr. Royal. (4:12-4:47). From the video, is does not appear that the paramedics physically examined Mr. Royal. *Id*. At minute 4:55, Detective Franceus states that at some point Mr. Royal will "have to get cleared" and that "lock up won't take him because he's ingested narcotics." (4:53-5:01). At approximately minute 8:45, Detective Franceus leaves the scene with Mr. Royal in the back of his vehicle. (8:45). A minute later, Detective Franceus tells Mr. Royal that he is "going to take [him] up to our office," (10:04-10:07), and gives him a *Miranda* warning. (10:10-10:30). Several minutes later, Detective Franceus questions Mr. Royal about his drug use. (14:25-14:54). Detective Franceus tells Mr. Royal that it is never too late to stop using drugs. (18:22-18:25).

d.      City of Fort Wayne Interview Room Video (Def Ex. I).

The June 25, 2015 video of the City of Fort Wayne Police Department Interview Room 8 begins at 11:48 a.m. with Mr. Royal seated on a chair behind a table with his leg chained to the floor. (Def. Ex. I.). For ten minutes, Mr. Royal stays seated with his arms resting on his legs and his head hanging down. At 11:59 a.m., he put his head down on the table. At 12:06 p.m., with his head still on the table, Mr. Royal begins rapidly bouncing his leg, causing the chain to rattle. At 12:10 p.m., Mr. Royal sits up and says loudly, "Officer." After fifteen seconds, he gets up from his chair, walks to the side of the table, leans forward, and says, "Hey Officer." After twenty seconds, he calls out, "Officer." Getting no response, he returns to his chair and hangs his head. At 12:13 p.m., Mr. Royal gets up again, moves to the side of the table, leans forward, and calls out, "Officer." He calls out "Officer" three more times at intervals. At 12:14 p.m., Detective Franceus enters the room and asks Mr. Royal if he is okay. Mr. Royal responds, "yeah," and asks for coffee. Detective Franceus offers him water, which Mr. Royal accepts. Detective Franceus asks him again if he is feeling okay, asks if he is sure, and tells him to have a seat. At 12:15 p.m. Detective Franceus enters the room, hands Mr. Royal the bottle of water, and leaves.

Mr. Royal takes a drink of water, places the bottle on the table, and then sits and hangs his head. At 12:16 p.m., Mr. Royal begins shifting slightly side to side in his chair. At 12:17 p.m., he rubs his hands on his thighs. He takes another drink of water and returns the bottle to the table. He continues to sit with his arms resting on his legs with his head down, shifting slightly side to side in the chair. At 12:18 p.m., he begins mumbling. At 12:19 p.m., he sits up straight with his hands in his lap and mumbles something. At 12:20 p.m., Mr. Royal makes the sign of the cross over himself. At 12:21 p.m., Mr. Royal sits up with his eyes closed and takes a drink of water; his leg

begins bouncing rapidly, rattling the chain. At 12:22 p.m., he puts his head down and mutters. At 12:23 p.m., he makes a noise, slowly sits up, and stretches his arms straight out in front of him; his body begins shaking. He attempts to take the water bottle, misses, takes the bottle, takes a drink, and sets the bottle on the table with difficulty, his arms unstable. His eyes are closed. He starts wavering back and forth, with his fingers at the edge of the table. He slowly pushes the chair back from the table against the wall with his arms outstretched in front of him.

At 12:24 p.m., he is shaking in the chair and grabbing for the table in front of him, moving his legs rapidly in a stomping motion, beginning to tip off the chair to his right. His legs flail, he grabs for the desk, and he tips to the right. During this time, the chain is rattling and the chair is hitting the wall. At 12:25 p.m., Mr. Royal's body is half off the chair and he is still shaking. He then slides off the chair horizontally to the ground, his body and legs shaking. It sounds as if he is panting and breathing heavily. For approximately one minute, it appears that he is holding his head up. At 12:26 p.m., he appears to try to stand, but then lies on the floor, his body and legs shaking, with the chain rattling. Only his feet are visible, his body obscured by the table. He is lying on his back. He can be heard gasping and taking deep breaths. At 12:27 p.m., his body continues to make sudden, shaking movements, with his entire body convulsing, and he makes loud breathing sounds. The chain rattles intermittently. At 12:28 p.m., Mr. Royal is on the ground on his back, breathing heavily; his legs are not moving.

Thirty seconds later, Detective Franceus opens the door, asks, "You alright?", and walks to the back of the table to view Mr. Royal; there is no audible response. Detective Franceus immediately calls for medical assistance. Detective Franceus removes the chair, turns and keeps Mr. Royal on his side, speaks reassuring words, and taps Mr. Royal rhythmically on the back. At 12:30

p.m., Detective Franceus calls for additional help, stating that Mr. Royal is "seizing up on me." At 12:31 p.m., Detective Franceus requests the status of the EMS and asks for additional help, stating that he needs to start CPR. At 12:32 p.m., Mr. Royal is removed from the interview room; the video recording ends at 12:45 p.m.

7.     *Death Investigation Report*

The City of Fort Wayne Police Department Internal Affairs In-Custody Death Investigation Report provides: "On June 25th, 2015, at approximately 11:30 a.m. a male suspect identified as Lance Royal was brought to the 2nd floor of the POC [Police Operations Center] for an interview with detectives following a traffic stop that yielded probable cause for a narcotics arrest. Once at the POC, Royal was placed into interview room 8 by Det. Kurt Franceus. Moments later Royal began to have what appeared to be a seizure." (ECF 31-2) (Pl. Ex. 2, p. 2). The report further provides, "Royal was transported to St. Joe Hospital where he was later pronounced deceased." *Id.* In the "Narrative of Events," the report provides, "During the apprehension Royal was attempting to swallow a substance detectives believed to be narcotics." *Id.* The report also provides that, once Mr. Royal was in the interview room, Detective Franceus "shackled his leg to the floor, left the room and started the video recording system." *Id.* at p. 8. The report states that "Franceus said that he was able to remotely monitor the interview room Royal was in on the computer screen . . . . Franceus said he periodically checked the monitor as they were working. He said Royal was just sitting there. Although he didn't know exactly how many times he looked at the monitor, he described it as 'several times.'" *Id.*

Detective Franceus states in the report that he "sprinted down to the interview room to see if Royal was okay" when he "saw Royal leaning over the table as if he may be on the verge of

getting sick." *Id*. Detective Franceus also says that he "heard a 'bang' coming from the area of room #8, where Royal was located. Franceus initially thought Royal might be trying to break a chair or trying to get out of the room. Franceus said that he entered the video room where all the monitors are located and saw that Royal wasn't trying to get away, it appeared he was trying to lay down and get comfortable." *Id*. at 8-9.

The report states that Detective Franceus was asked "if he was aware that Royal had called out for officers a couple of times while he was in the interview room. Franceus said he didn't hear anything." *Id*. at 9. After entering the room the second time, "Franceus advised that approximately 1 minute into the situation Royal let out a gasp and went lifeless." *Id*. at 9. According to the City of Fort Wayne's investigation, "The toxicology report dated 7-21-2015 found cocaine in Royal[']s system. According to the Allen County Deputy Coroner Rebecca Stuttle, although there is no such thing as a 'safe' amount of cocaine in someone[']s system. The amount found in Royal's system would be considered a fatal dose." *Id*.

8.    *Defendants' Answers to Interrogatories*

No medical treatment was provided to Mr. Royal en route from the scene of his arrest to the police station. (ECF 31-3) (Pl. Ex. 3, No. 9). Detective Franceus was the only city officer present with Mr. Royal at the time he was confined in the police station interview room. *Id*. at No. 14. The individual defendant officers "have been involved in hundreds of investigations concerning the buying, selling, or use of cocaine." *Id*. at No. 20.

9.    *Internal Affairs Interviews of Detective Gutierrez and Detective Norris*

In his internal affairs interview, Detective Gutierrez states, describing opening the door of the vehicle to arrest Ms. Gentry, "So I opened the door up. I saw like baggies torn, like a little white

cloud everywhere. And I saw her and then I briefly saw Lance." (ECF 31-4) (Pl. Ex. 4, Gutierrez interview at 3). In Detective Norris' internal affairs interview, describing opening the driver's side of Mr. Royal's vehicle to remove Mr. Royal, "I opened the driver's door. Tell him to step out. As I'm opening that I see a, you know, a cloud. . . . It's probably a cocaine cloud in the car, the haze of it." *Id*. (Norris interview at 3).

*10.    Detective Franceus' Deposition*

Detective Franceus acknowledged that, as a City of Fort Wayne narcotics detective, he is trained to identify the appearance, effects, and danger of drugs. (ECF 31-5) (Pl. Ex. 5, at 9). Detective Franceus acknowledged that the ingestion of as little as .2 grams of cocaine could be dangerous to someone's health. *Id*. at 15. He testified that, if an individual in his custody told him that they had used as little as .2 grams of cocaine or if he witnessed them use at little as .2 grams of cocaine, he would have that person medically evaluated. *Id*. at 16. He further testified that if someone showed signs of a cocaine overdose, that person should receive medical attention immediately. *Id*. at 18. Detective Franceus testified that the consumption of cocaine can cause "heart attacks," which can "lead to death." *Id*. at 19. He testified that if cocaine is ingested orally, rather than smoked, "the drug is absorbed more slowly." *Id*. at 30-31. He acknowledged that consumption of less than one gram of cocaine can cause intoxication. *Id*. at 21.

Regarding his training by the City of Fort Wayne, Detective Franceus testified that he did not know what quantity of cocaine would be lethal to a person. *Id*. at 12. He testified that he was not trained by the City of Fort Wayne to recognize whether ingestion of between .2 grams and 1gram of cocaine could be lethal to an adult. *Id*. at 15. He did not know how long negative health effects would take to show in a person who had overdosed on cocaine. *Id*. at 17. He was not trained to

recognize how long it would take a person who had overdosed on cocaine to die. *Id*. Detective

Franceus testified that, at all times during his interactions with Mr. Royal on June 25, 2015, he acted

in accordance with his training by the City of Fort Wayne and did not violate any of the policies of

the City of Fort Wayne. *Id*. at 28-29.

Detective Franceus acknowledged that, on June 25, 2015, cocaine was found in Mr. Royal's

vehicle, in Mr. Royal's possession, physically on Mr. Royal's body, and around Mr. Royal's mouth.

*Id*. at 20-21. Detective Franceus testified that he was the only officer monitoring Mr. Royal in the

interview room. *Id*. at 23. He testified that he saw Mr. Royal lying on the floor of the interview room

prior to entering the room the final time and "thought maybe he was taking a nap or trying to get

more comfortable." *Id*. at 28. He testified that the video monitor of Mr. Royal in the interview room

provided video and audio. *Id*. at 24. Detective Franceus did not keep a constant watch on Mr. Royal

by surveillance video or any other means. *Id*. at 32. Detective Franceus testified that there was a time

period of probably three minutes (but not more than five minutes) that he was not observing Mr.

Royal in the interview room. *Id*. Detective Franceus acknowledged that, upon review of the

interview room video recording of Mr. Royal prior to Detective Franceus' final entrance into the

room, "there were indications that he was having a medical issue." *Id*. at 27.

11.    *Deposition of Porshea Gentry*

Porshea Gentry testified that she told the police officers that "we need medical attention."

(ECF 31-6) (Pl. Ex. 6, at p. 17). Ms. Gentry testified that she made this statement to the officers

"over and over," *id*. at 17, saying it "at least three times," *id*. at 19. Ms. Gentry testified, "I know I

made sure I told them he needed medical attention." *Id*. at 21. Ms. Gentry testified that she could

tell from the way Mr. Royal looked that he did not feel well, explaining that he looked like he was "on a high." *Id.* at 23.

## ANALYSIS

Defendants seek summary judgment on all of Plaintiff's claims, asserting that the evidence of record demonstrates that the officers were not aware of Mr. Royal's medical need. In response, Plaintiff contends that there is a factual dispute for the jury as to whether the officers were on notice of Mr. Royal's serious medical need when they failed to take him to the hospital on June 25, 2015, while under arrest. Plaintiff further contends that there is a question as to whether the actions of the officers demonstrate the City of Fort Wayne's failure to train them to recognize and respond to the serious medical needs of arrestees in their custody. The Court considers each claim in turn.

### A. 42 U.S.C. § 1983—Fourth Amendment Failure to Provide Medical Care

Plaintiff brings her federal constitutional claim for failure to provide medical care under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983. Police officers have a constitutional duty to provide adequate medical treatment to individuals in their custody. *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013). The Fourth Amendment's objective reasonableness standard applies when, as in this case, an individual is arrested without a warrant and has not yet had a judicial determination of probable cause. *See Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) (citing *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006)); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 503 (7th Cir. 2010); *see also*

*Otis v. Demarasse*, 886 F.3d 639, 645 (7th Cir. 2018) (affirming that case law in the Seventh Circuit Court of Appeals provides that the Fourth Amendment controls claims for failure to provide medical care brought by a person arrested without a warrant and waiting to be taken before a judge); *Sheehan v. Noble Cnty. Sheriff's Dep't*, No. 1:14-CV-324, 2016 WL 7100555, at *9 (N.D. Ind. Dec. 6, 2016).[1]

A court considers four factors to determine whether an officer's response to an arrestee's medical needs was objectively unreasonable: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530 (citing *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)); *see also Williams v. Cline*, — F.3d —, —, No. 1-2603, 2018 WL 4171058, at *4 (7th Cir. Aug. 31, 2018); *Otis*, 886 F.3d at 645; *Estate of Perry*, 872 F.3d at 453. A plaintiff must also show that the defendant's conduct caused the harm. *Ortiz*, 656 F.3d at 530.

This standard of "objective reasonableness under the circumstances" for establishing a Fourth Amendment medical care claim is lower than the "deliberate indifference" standard under

---

[1] Plaintiff's citation in the Complaint to the Fourteenth Amendment of the United States Constitution, rather than the Fourth Amendment, does not doom her claim. The Complaint pled sufficient facts to put Defendants on notice of the nature of Plaintiff's § 1983 claim for failure to provide medical care. *See Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017) (recognizing that there is no duty to plead legal theories).

Recently, the United States Supreme Court held that the Fourth Amendment, and not the Fourteenth Amendment, applies to a pretrial detainee's challenge to the legality of his pretrial confinement, even after a judge's determination of probable cause. *Manuel v. City of Joliet, Ill.*, — U.S. —, 137 S. Ct. 911, 914, 918 (2017). That decision does not appear to affect this Court's application of Seventh Circuit Court of Appeals' precedent that the Fourth Amendment applies to a claim for failure to provide medical care prior to a probable cause determination. *See Otis v. Demarasse*, 886 F.3d 639, 645 n. 27 (7th Cir. 2018) (declining to rely on *Manuel v. City of Joliet* in a § 1983 Fourth Amendment failure to provide medical care case because the parties had not argued whether the Seventh Circuit Court of Appeals' "pre/post-legal-process distinction to determine the applicability of the Fourth or Fourteenth Amendment is no longer viable after *Manuel v. City of Joliet, Ill.*").

the Eighth and Fourteenth Amendments. *Williams*, 509 F.3d at 403.[2] Also, the severity of the medical condition under the Fourth Amendment standard "need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendment." *Williams*, 509 F.3d at 403. Rather, "the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Ortiz*, 656 F.3d at 530 (citing *Williams*, 509 F.3d at 403).

1.    *Individual Defendant Officers—Constitutional Violation*

The third and fourth factors are not at issue on the instant motion because "the defendants do not assert that taking [Mr. Royal] to the hospital would have been burdensome or compromised any police interests." *Ortiz*, 656 F.3d at 530-31; *see also Cline*, — F.3d at —, 2018 WL 4171058, at *5. Defendants do not dispute that cocaine intoxication is a serious medical need, and Defendants do not seek summary judgment on causation. Thus, the question before the Court on the first factor is whether each defendant officer was on notice of Mr. Royal's need for medical care. *Ortiz*, 656 F.3d at 531; *see also Cline*, — F.3d at —, 2018 WL 4171058, at *5; *Acosta v. City of Chicago*, No. 15 CV 8333, 2018 WL 3630011, at *6 (N.D. Ill. July 31, 2018). "Officers can be placed on notice of a serious medical condition either by word or through observation of the detainee's physical symptoms." *Estate of Perry*, 872 F.3d at 454 (citing *Williams*, 509 F.3d at 403).

In their motion for summary judgment, the individual defendant officers address their collective lack of notice of Mr. Royal's medical needs, asserting that "defendants simply did not know that Lance Royal had any medical needs." (ECF 30, p. 4). In support, the officers identify the following facts to contend that they were not on notice of Mr. Royal's needs. Detective Norris

---

[2] In their brief, Defendants incorrectly assert that Plaintiff must show "proof of intentional wrongdoing or deliberate indifference to a serious medical need." (ECF 30, p. 2).

repeatedly yelled at Mr. Royal to spit out what was in his mouth, Detective Norris held Mr. Royal's jaw so he could not chew or swallow anything, Mr. Royal was in the prone position on the ground with a small amount of crack cocaine lying on the ground by his mouth, Sergeant Bowers believed that Mr. Royal had spit out all of the cocaine, Mr. Royal told Sergeant Bowers that he "just ate a little pill," and Detective Norris told Mr. Royal to open his mouth and stick out his tongue. Sergeant Bowers and Detective Norris told Mr. Royal to tell them if he had swallowed anything, that if he had it would not affect the criminal charges, and that they were worried about his health. Mr. Royal did not appear concerned with having eaten or swallowed any narcotics.

Defendants note that the paramedics checked on Mr. Royal at the scene, asking Mr. Royal several times if he was okay to which Mr. Royal responded in the affirmative, Mr. Royal denied ingesting any narcotics to the paramedics, and the paramedics determined that Mr. Royal did not need to go to the hospital. Detective Franceus did not believe Mr. Royal swallowed any narcotics because he heard Mr. Royal tell the paramedics that it was just "two rocks" and Detective Franceus retrieved two rock-like substances that appeared to be cocaine that Mr. Royal had spit on the ground. Detective Franceus observed Mr. Royal acting fine, and Mr. Royal did not express any concerns about his health. During the transport to the police operations center, Detective Franceus asked Mr. Royal several times how he was feeling, and Mr. Royal stated he was fine. Detective Franceus also asked if Mr. Royal swallowed anything, and Mr. Royal said he spit it out. Detective Franceus told Mr. Royal he did not want him to get sick, and Mr. Royal said he would be fine. During the drive, Detective Franceus did not see any indication that Mr. Royal was having a medical issue.

Finally, Defendants note that, at the police operations center, Mr. Royal did not have trouble walking and seemed fine. In the interview room, Detective Franceus asked Mr. Royal three times

if he was okay, and Mr. Royal responded that everything was okay, both before and after getting the bottle of water. During this time, Mr. Royal appeared normal and calm, and there was nothing about his behavior or appearance that indicated a medical issue. Finally, the officers note that, as soon as there was an indication of a medical problem at the police operations center, Detective Franceus radioed for an ambulance to come to the interview room, rolled Mr. Royal on his side and patted his back because he believed he was having a seizure, radioed again to check the status of the ambulance and request assistance from other detectives, and moved Mr. Royal into the hallway to began CPR. The EMS and fire department worked on Mr. Royal and then transported him to the hospital where physicians worked on him. As for the seriousness of Mr. Royal's medical need, Defendants do not argue that Mr. Royal did not have a serious medical need but rather that they did not know that he had any medical need.

In contrast, Plaintiff contends that there is a genuine dispute of material fact as to whether the five officers were on notice of Mr. Royal's serious medical need after they arrested him while he was chewing cocaine, with cocaine in his mouth, on his lips, and on his face and with cocaine covering the interior of the vehicle, and whether it was objectively reasonable for the officers not to take Mr. Royal to the hospital to be screened. Plaintiff contends that the facts show that each officer either knew that Mr. Royal was in physical danger of cocaine intoxication or was likely to have known Mr. Royal was in physical danger of having recently ingested cocaine. It is undisputed that no officer took Mr. Royal to the hospital to have him examined or monitored or took steps to ensure that Mr. Royal received such treatment.

Plaintiff argues that the evidence shows that each officer was on notice that Mr. Royal needed medical care for a serious medical need. Some of the facts identified by Plaintiff in the

Statement of Genuine Disputes include the officers' knowledge, prior to the vehicle stop, of the ongoing narcotics investigation and the warrant for Ms. Gentry's arrest related to narcotics trafficking; the length of time that Mr. Royal and Ms. Gentry were driving in the car from the apartment complex before they were stopped by Officer Gutierrez; the fact that Mr. Royal was chewing cocaine at the time he was removed from the car; the fact that Mr. Royal was removed from the car by Officer Norris after Detective Gutierrez had already started removing Ms. Gentry from the car; that despite spitting out some cocaine at the order of Detective Norris, Mr. Royal was still chewing something and had to be ordered again to spit; four of the officers were narcotics detectives; the flecks of cocaine photographed on Mr. Royal's mouth after he spit out the cocaine; the quantity of powder cocaine visible in the car as well as torn baggies and baggies of cocaine in the car; the "cloud" of cocaine in the car; Detective Gutierrez's warning to the other officers about the cocaine in the car; the fact that Mr. Royal may have violated his federal probation rules; Ms. Gentry's physical condition; Ms. Gentry's request that the officers get medical help for Mr. Royal; the information the officers provided to the paramedics; and Detective Franceus' discussion with other officers at the scene of the arrest that Mr. Royal would have to be "cleared" before he could be taken to the jail.

Despite Mr. Royal's reassurances to the officers that he had not swallowed anything, under all the circumstances, a jury could infer from these facts that the defendant officers were on notice that Mr. Royal may have ingested an unknown quantity of cocaine, which is a serious medical condition, and that the failure to seek medical help in the form of taking him to the hospital was objectively unreasonable. "The question is not whether a particular defendant knew what was wrong with [Mr. Royal], but rather whether the defendant, based on what [he] observed [himself] and

learned from others, should reasonably have known that [Mr. Royal] needed medical care." *Ortiz*, 656 F.3d at 533.

Because the objective reasonableness inquiry is specific as to each officer, the Court considers whether the relevant facts raise a genuine dispute for the jury as to each officer. *Estate of Perry*, 872 F.3d at 455, 456; *Ortiz*, 656 F.3d at 531-32; *see also Williams*, — F.3d at —, 2018 WL 4171058, at *6. Thus, the question on summary judgment "is whether a jury could find that it was objectively unreasonable for each defendant to take no action to seek medical care for [Mr. Royal] based on what [the officer] knew at the time." *Ortiz*, 656 F.3d at 531-32. As set forth below, there is a factual issue to be resolved by the jury as to whether each officer was on notice of Mr. Royal's serious medical need and whether it was objectively reasonable for each officer not to seek medical care for Mr. Royal.

    a.    Detective Gutierrez

Detective Gutierrez made the traffic stop with knowledge of the ongoing narcotics investigation. Detective Gutierrez followed Mr. Royal's car for a minute and a half. Approximately forty seconds passed from the time Detective Gutierrez stopped the vehicle and when he opened the passenger door of the vehicle. Another twenty seconds passed before Detective Norris opened the driver's door of the vehicle. When he opened the car door to arrest Ms. Gentry, Detective Gutierrez saw torn baggies and a "white cloud everywhere." Detective Gutierrez observed Mr. Royal chewing something as he was taken out the vehicle by Detective Norris, and Detective Gutierrez heard Detective Norris tell Mr. Royal to "spit it out." Detective Gutierrez took the picture of Mr. Royal that showed white flecks on his lips, around his mouth, in his moustache, and on his right cheek.

Detective Gutierrez interacted with Ms. Gentry who was feeling nauseous and for whom he called the paramedics.

Detective Gutierrez told other officers that when he opened the vehicle door, "cocaine was flying everywhere." Detective Gutierrez warned another officer that there is "cocaine everywhere." He warned the paramedics that Ms. Gentry felt nauseous and that "there was a whole bunch of cocaine everywhere," gesturing toward the vehicle and that he did not know what she swallowed. He told the paramedics that Mr. Royal was "chewing the stuff." In telling Detective Franceus about the stop, Detective Gutierrez said, "There was cocaine everywhere." Detective Gutierrez talked about which hospital would be able to "clear Ms. Gentry." In describing Mr. Royal's ability to drive the car, Detective Gutierrez used the phrase "all coked out." He determined that only a general inventory of the car could be done because there was too much cocaine in the front of the vehicle, and he warned the tow truck driver regarding the presence of cocaine and razor blades in the vehicle. Detective Franceus commented to Detective Gutierrez that Mr. Royal and Ms. Gentry "were eating [the cocaine] probably while you were following them."

Based on these facts, a jury could conclude that Detective Gutierrez was on notice of Mr. Royal's serious medical need and that it was objectively unreasonable not to seek medical care for Mr. Royal.

b. Detective Norris

Detective Norris was an undercover Vice and Narcotics Detective on June 25, 2015, assisting with surveillance of the ongoing narcotics investigation. At the traffic stop, Detective Norris approached the driver's side of the vehicle where Mr. Royal was seated; he observed Mr. Royal digging in his pocket or the center console of the vehicle. Detective Norris observed a "cocaine

cloud in the car." As he was removing Mr. Royal from the vehicle and putting him on the ground, Detective Norris observed Mr. Royal chewing and observed a white powder and rock-like substance on Mr. Royal's face. Detective Norris repeatedly yelled at Mr. Royal to spit out what was in his mouth, holding his jaw so that he could not chew or swallow anything. Detective Norris observed Mr. Royal spit out a small amount of crack cocaine but noted that Mr. Royal was still chewing. Detective Norris again yelled for Mr. Royal to spit it out, and Mr. Royal spit out small pieces of crack cocaine. Mr. Royal told Detective Norris he had eaten or chewed "just a pill." Detective Norris repeatedly told Mr. Royal to tell him if he had swallowed anything and that it would not affect the charges, explaining that he was worried about Mr. Royal's health. On Sergeant Bowers' body camera recording, either Detective Norris or Sergeant Bowers can be heard saying to the other, "He's still eating." Detective Norris knew that the paramedics spoke with Mr. Royal at the scene and did not transport him to the hospital. Detective Norris was present when Detective Gutierrez commented on Mr. Royal's ability to drive the car and used the phrase "all coked out."

Based on these facts, a jury could conclude that Detective Norris was on notice that Mr. Royal had a serious medical need and that it was objectively unreasonable not to seek medical care for Mr. Royal.

c.      Sergeant Bowers

On June 25, 2015, Sergeant Bowers was a Sergeant Vice and Narcotics, was working in an undercover capacity, and was involved in the ongoing narcotics investigation involving Ms. Gentry. Sergeant Bowers knew that Mr. Royal was in the car with Ms. Gentry. At the traffic stop, he approached the vehicle as Officer Norris was in the process of detaining Mr. Royal, and Sergeant Bowers could hear Officer Norris repeatedly telling Mr. Royal to "spit it out." Sergeant Bowers saw

a small amount of what he believed to be crack cocaine lying on the ground by Mr. Royal's mouth. Mr. Royal told Sergeant Bowers that he just ate a little pill. Sergeant Bowers told Mr. Royal to spit out anything he was chewing, that it would not affect the criminal charges, that he was concerned about Mr. Royal's health, and that he did not want him to have heart attack. On Sergeant Bowers' body camera recording, either Detective Norris or Sergeant Bowers can be heard saying to the other, "He's still eating." Sergeant Bowers knew that Ms. Gentry was feeling sick and told Officer Gutierrez to call the EMS. On the body camera recording, Sergeant Bowers says that Ms. Gentry "ingested a bunch of dope." Sergeant Bowers suggested that the paramedics check Mr. Royal to see if they needed to take him to the hospital but then stated, "I don't think you do." Ultimately, Sergeant Bowers knew that the paramedics did not transport Mr. Royal. Sergeant Bowers observed a small amount of cocaine in the red Dodge Charger on the driver's side and a heavy amount of powder and crack cocaine residue and debris on the passenger side. Sergeant Bowers believed that Mr. Royal may have put cocaine in his mouth but believed that Mr. Royal had spit it all out at the traffic stop because they had recovered one and a half grams that he had spit out. Sergeant Bowers knew that Mr. Royal had cocaine in his mouth at the time he was removed from the car. Sergeant Bowers was present when Detective Gutierrez commented on Mr. Royal's ability to drive the car and used the phrase "all coked out."

Based on these facts, a jury could conclude that Sergeant Bowers was on notice that Mr. Royal had a serious medical need and that it was objectively unreasonable not to seek medical care for Mr. Royal.

d.    Detective Heath

On June 25, 2015, Detective Heath was a detective with the Vice and Narcotics Division in an undercover capacity. That day, he had been briefed about the search warrant that was being served at Ms. Gentry's residence. Detective Heath observed Mr. Royal and Ms. Gentry get into Mr. Royal's car. When Detective Heath arrived at the traffic stop, he helped Detective Gutierrez handcuff Ms. Gentry. Detective Gutierrez alerted Detective Heath that there was cocaine all over the vehicle and some outside the vehicle. Detective Gutierrez told Detective Heath that he observed Ms. Gentry attempting to ingest cocaine. Detective Heath then assumed responsibility for photographing and collecting the evidence from the vehicle, which included 7.2 grams of cocaine. He also observed empty knotted baggies as well as baggies containing cocaine. Detective Heath was aware that Detectives Franceus and Norris located an off-white chunky substance that had been in Mr. Royal's mouth, which Detective Heath states field tested positive for cocaine base with a weight of .4 grams. Detective Heath did not have any contact with Mr. Royal. He observed the paramedics speak with Mr. Royal and transport Ms. Gentry; Detective Heath did not speak with the paramedics. It appears from the video that Detective Heath was within ear shot of Detective Gutierrez's comment about Mr. Royal's ability to drive the car and that Mr. Royal was "all coked out."

Based on these facts, a jury could conclude that Detective Heath was on notice of Mr. Royal's serious medical need and that it was objectively unreasonable not to seek medical care for Mr. Royal.

e.    Detective Franceus

On June 25, 2015, Detective Franceus was a uniformed detective with Vice and Narcotics and was aware of the surveillance of Ms. Gentry. Arriving last at the scene, Detective Franceus

approached the vehicle and heard Sergeant Bowers yelling, "Spit it out, spit it out." Detective Franceus observed Mr. Royal being handcuffed and spitting out what Detective Franceus believed to be cocaine. Detective Franceus picked up the cocaine that Mr. Royal had spit out, placed it in an evidence bag, and gave it to Detective Heath for processing. Detective Franceus heard Sergeant Bowers tell the paramedics that Mr. Royal had been chewing some "rock." Detective Franceus observed the paramedics speak with Mr. Royal, which involved the paramedics asking and/or confirming three times that Mr. Royal was okay and Mr. Royal telling the paramedics that he did not ingest any narcotics. Detective Franceus thought that Mr. Royal did not swallow any narcotics because he heard Mr. Royal tell the paramedics that it was "just two rocks" and Detective Franceus saw the two pieces of cocaine on the ground that Mr. Royal had spit out. Detective Franceus states that Mr. Royal seemed fine. However, Detective Franceus can also be heard on the video stating that Mr. Royal will "have to get cleared" and that "lock up won't take him because he's ingested narcotics."

Detective Gutierrez told Detective Franceus that when Detective Gutierrez approached the vehicle, "there was cocaine everywhere." When Mr. Royal was in his car, Detective Franceus said to Mr. Royal that if he couldn't "figure out what the problem is, then [he has] bigger problems," and then exited the car and repeated the conversation to other officers, laughing. In reference to Detective Gutierrez deciding to make the traffic stop rather than allowing Mr. Royal to continue to drive, Detective Franceus can be heard saying, "That's probably better because they were eating it probably while you were following them." Both these statements can be interpreted as Detective Franceus recognizing that Mr. Royal had ingested a quantity of narcotics. During the transport to the police operations center, Detective Franceus learned that Mr. Royal may have violated his

federal probation rules. During the transport, Detective Franceus again asked Mr. Royal if he was okay and stated that he did not want him to get sick. Detective Franceus knows that as little as .2 grams of cocaine can be dangerous to someone's health, and he testified that if he had seen someone use .2 grams of cocaine, he would have them medically evaluated. He knows that the consumption of cocaine can cause a heart attack, which can lead to death.

Based on these facts, a jury could conclude that Detective Franceus was on notice of Mr. Royal's serious medical need and that it was objectively unreasonable not to seek medical care for Mr. Royal.

### 2. *Qualified Immunity*

The individual defendant officers argue that they are entitled to qualified immunity on Plaintiff's § 1983 Fourth Amendment claim. "Qualified immunity 'protects public servants from liability for reasonable mistakes made while performing their public duties.'" *Estate of Perry*, 872 F.3d at 460 (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)). This is a two-prong inquiry, either of which can be considered first: "'(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Id.* (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (internal quotation marks omitted)). "'Qualified immunity is an individual defense available to each individual defendant in his individual capacity.'" *Williams*, — F.3d at —, 2018 WL 4171058, at \*5-6 (explaining that under the first prong of the qualified immunity analysis the court should evaluate each officer's conduct in light of the four factors set forth in *Ortiz* (quoting *Bakalis v. Golembeski*, 35 F.3d 318, 326-27 (7th Cir. 1994))). This is especially true "when the facts relative to the alleged constitutional violation

differ from defendant to defendant." *Id.* (citing *Petties v. Carter*, 836 F.3d 722, 731-33 (7th Cir. 2016); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)).

As set forth in the previous section, this Court has found that the facts, taken in the light most favorable to Plaintiff, make out a violation of Mr. Royal's constitutional right to medical care by each defendant officer. Therefore, the Court turns to the second question of whether the right, defined at an appropriate level of specificity, was clearly established at the time of the alleged violation. *See Estate of Perry*, 872 F.3d at 460; *see also Williams*, — F.3d at —, 2018 WL 4171058, at *6 (citing *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013)). The United States Supreme Court recently reiterated the longstanding principle that the "clearly established law" should not be defined "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The "clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 551 (quoting *Mullenix v. Luna*, 577 U.S. —, —, 136 S. Ct. 305, 308 (2015)); *Thompson v. Cope*, — F.3d —, — , No. 17-3060, No. 18-1223, 2018 WL 3849381, at *4 (7th Cir. Aug. 14, 2018) (quoting *al-Kidd*, 563 U.S. at 741). A case directly on point is not required. *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 577 U.S. at —, 136 S. Ct. at 308); *Thompson*, — F.3d at —, 2018 WL 3849381, at *4, *5 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *al-Kidd*, 563 U.S. at 741). Moreover, "'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness must be apparent.'" *White*, 137 S. Ct. at 552 (internal citations omitted).

In 2017, the Seventh Circuit Court of Appeals held that, as of at least 2010, it was clearly established that the Fourth Amendment governed medical care claims by detainees who had not yet received a judicial probable cause determination, that the four factors set out in *Ortiz* were well established, and that, under the clearly established objectively reasonable standard of the Fourth Amendment, "the failure to take any action in light of a serious medical need would violate that standard." *Estate of Perry*, 872 F.3d at 460 (citing *Williams*, 509 F.3d at 403)); *see also Acosta*, 2018 WL 3630011, at *7 (citing *Estate of Perry*, 872 F.3d at 460). In the context of a claim under the Eighth Amendment for failure to treat a serious medical need, the Seventh Circuit Court of Appeals held that the constitutional right to treatment for serious medical needs has long been established and that, for purposes of qualified immunity, the "legal duty need not be litigated and then established disease by disease or injury by injury." *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1285, 200 L. Ed. 2d 471 (2018). Given the lower standard for a Fourth Amendment claim for failure to provide medical care, the analysis in *Walker* is persuasive.

The Fourth Amendment right to medical care is beyond debate and was clearly established on June 25, 2015. The officers do not contest that this is the applicable standard. Rather, the officers argue that there is no clearly established law that they violated Mr. Royal's rights when they did not know that he had a medical need. But this argument conflates the first and second elements of qualified immunity and would impermissibly require the Court to construe the facts in Defendants' favor. Because Plaintiff has met the first prong by raising a genuine dispute as to whether the officers were on notice of Mr. Royal's medical need for evaluation and monitoring for a cocaine overdose, the second prong is necessarily defined by the facts viewed in the light most favorable to

Plaintiff, namely that the officers knew that Mr. Royal had a serious medical need. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (recognizing that "[o]ur qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard" and cautioning courts, for purposes of the "clearly established" analysis, not to define the specific context of a case in a manner that imports genuinely disputed factual propositions).

Because Plaintiff has met her burden on summary judgment of establishing that there was a violation of Mr. Royal's right and that the right was clearly established in 2015, the Fourth Amendment claim must be submitted to a jury for consideration. *Id.*; *compare Gant v. City of Fort Wayne*, 1:16-CV-380, 2018 WL 689799, at \*4 (N.D. Ind. Feb. 2, 2018) (denying summary judgment for defendant officer on qualified immunity as to excessive force claim because a factual dispute existed as to whether the plaintiff in fact had a gun in his hands at the time the officer shot him). The Court denies the motion for summary judgment on the Fourth Amendment claim for failure to provide medical care brought against the five defendant officers.

3.      *City of Fort Wayne—Liability for Failure to Train*

In the Complaint, Plaintiff alleges that the City of Fort Wayne maintained a wrongful policy, practice, custom, or procedure of failing to adequately train and/or supervise police officers concerning their duty to provide and facilitate post-arrest medical care to individuals in their custody and that this failure led to Mr. Royal's death. (Compl. ¶¶ 5, 28-31).

To establish a *Monell* claim against the City of Fort Wayne for the alleged constitutional violation by the officers, Plaintiff must prove that the officers acted pursuant to (1) an official policy, (2) a practice or custom that although not officially authorized, was widespread and settled, or (3)

instructions from a city official with final policy-making authority. *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978))). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A failure-to-train claim is actionable only if the failure amounted to deliberate indifference to the rights of others." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 345 (7th Cir. 2018) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see Connick*, 563 U.S. at 61 (quoting *City of Canton*, 489 U.S. at 388). "Deliberate indifference exists where the defendant (1) failed 'to provide adequate training in light of foreseeable consequences'; or (2) failed 'to act in response to repeated complaints of constitutional violations by its officers.'" *Miranda*, 900 F.3d at 345 (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006)). The municipality "must have actual or constructive notice of a problem." *Id.* (citing *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997)). "Deliberate indifference is a stringent standard of fault." *Connick*, 563 U.S. at 61 (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)).

Here, Plaintiff has not offered any evidence of a pattern of similar constitutional violations. Rather, Plaintiff relies on what the Supreme Court has termed "single-incident" liability where "'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *See Connick*, 563 U.S. at 63 (citing *Canton*, 489 U.S. 378; *Bryan Cnty.*, 520 U.S. at 409); *Leibowitz v. DuPage Cnty. Ill.*, No. 12 C 6539, 2018 WL 1184731, at *4 (N.D. Ill. Mar. 7, 2018). Plaintiff argues generally that the officers' conduct regarding Mr. Royal demonstrates the

City of Fort Wayne's failure to train and supervise narcotics officers. But Plaintiff has not shown that a "patently obvious" failure to train led to the officer's failure to obtain medical care for Mr. Royal. *Connick*, 563 U.S. at 64. Plaintiff has not shown that the City of Fort Wayne did not provide training to its officers regarding narcotics, overdoses, and/or obtaining medical care for arrestees or that the City of Fort Wayne was on actual or constructive notice that an omission in the officers' training program would cause the violation of constitutional rights. Plaintiff offers no evidence regarding the officers' training other than Detective Franceus' deposition testimony that he acted in accordance with his training at all times.

Although the facts presented by Plaintiff on this motion create a genuine dispute for trial as to whether the officers were on notice of Mr. Royal's serious medical need, those same facts do not meet the heightened standard of demonstrating that the City of Fort Wayne was deliberately indifferent in training its officers in relation to the facts of this lawsuit. The Court grants summary judgment in favor of the City of Fort Wayne on the § 1983 *Monell* claim.

4.    *Fourteenth Amendment Claim for Termination of Family Relationship*

Shondra Royal as an individual is not a party to this lawsuit; she is listed in the caption as the personal representative of the Wrongful Death Estate of Mr. Royal. Thus, all claims in this case are brought on behalf of Mr. Royal's estate and are based on Mr. Royal's cause of action; the claims are not brought by Shondra Royal individually on her own behalf.

In the Complaint, Plaintiff alleges that, under the Fourteenth Amendment, state actors may not purposefully terminate or interfere with the familial relationship of individuals, including the relationship of a wife and husband. (Compl. ¶ 30). However, Defendants argue that there is no evidence in this case that the detectives purposefully terminated a family relationship or that their

actions were taken with the intent to terminate the relationship. In response, Plaintiff does not identify any evidence that the detectives acted with the intent to interfere with the marital relationship.

In addition, Plaintiff has failed to identify any case law recognizing a Fourteenth Amendment liberty interest claim for termination of the marital relationship when the government actions were not taken with the intent to interfere with the familial relationship. *See Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005) (holding that there is no constitutional right to recover for the loss of companionship of an adult child when that relationship is terminated as an incidental result of state action and not because of the state actor's purposeful interference with the familial relationship (overruling *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984))); *Thompson v. City of Chicago*, 472 F.3d 444, 452 n. 25 (7th Cir. 2006) (recognizing that, under *Russ*, the decedent's mother and wife did not have standing to pursue a § 1983 action based on a familial relationship when there was no allegation that the decedent was killed for the specific purpose of terminating the familial relationships); *Neal v. Backs*, 1:15-CV-168, 2016 WL 5933429, at *4 (N.D. Ind. Oct. 12, 2016) (dismissing a § 1983 claim for loss of consortium when no facts were alleged to show that the defendant purposefully interfered with the plaintiff's familial relationship (citing *Russ*, 414 F.3d at 790)). Therefore, the Court grants summary judgment in favor of Defendants on Plaintiff's Fourteenth Amendment claim based on a liberty interest in marriage.

In paragraph 31 of the Complaint, which is under the heading for Fourteenth Amendment constitutional claims, Shondra Royal asserts that she personally incurred damages, including but not limited to funeral and burial expenses, lost earnings, loss of love, care, affection, consortium, services, society, and companionship, as well as severe mental and emotional anguish. (Compl. ¶

31). Defendants argue that the Seventh Circuit Court of Appeals has not recognized a spouse's claim for loss of consortium brought under § 1983. As noted above, Shondra Royal is not listed in the caption as a plaintiff. Even if she were, she has not identified any case law recognizing an independent § 1983 claim for loss of consortium. *See Neal*, 2016 WL 5933429, at *4. Therefore, the Court grants summary judgment in favor of Defendants on any loss of consortium claim brought by Shondra Royal herself as an individual under § 1983.

However, this ruling does not address whether damages for loss of consortium are available on the estates's § 1983 claims. *See, e.g.*, *Estate of Gee ex rel. Beeman v. Bloomington Hosp. and Health Care Sys., Inc.*, No. 1:06-CV94, 2012 WL 729269, at *4 (S.D. Ind. Mar. 6, 2012) (finding that the estate of the decedent was entitled to seek damages under § 1983 for loss of consortium); *White v. Gerardot*, No. 1:05-CV-382, 2008 WL 2338307, at *5 (N.D. Ind. June 4, 2008) ("In short, because the Indiana Wrongful Death Statute expressly provides for the recovery of damages for a decedent's loss of love and companionship, and because [defendant] does not assert that the recovery of these expenses is in any way inconsistent with the purposes of § 1983, [the personal representative of the estate] is legally entitled as the estate's personal representative to seek damages for the loss of [the decedent's] love and companionship." (internal citation omitted)).

5. *Punitive Damages*

Defendants seek summary judgment in their favor on Plaintiff's claim for punitive damages. Punitive damages may be assessed in a § 1983 case "when the defendant's conduct is shown to be motivated by evil intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Marshall v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002); *Merritt v. De Los Santos*, 721 F.2d 598, 601 (7th Cir. 1983) (citing *Smith v. Wade*, 461 U.S. 30 (1983)). The Seventh

Circuit Court of Appeals requires "a showing of aggravating circumstances or malicious intent to justify the award of punitive damages." *Merritt*, 721 F.2d at 601. Defendants argue that there is no evidence that Defendants' actions were motivated by evil motive or intent, or that their actions involved reckless or callous indifference to Mr. Royal's federally protected rights.

Plaintiff responds that the evidence would permit a reasonable jury to award punitive damages against the individual officers, contending that the evidence of outrageous conduct includes Detective Gutierrez recognizing that Mr. Royal was "all coked out" but failing to ensure that he was medically cleared at the hospital; Sergeant Bowers advising the paramedics not to take Mr. Royal to the hospital; Detective Norris observing Mr. Royal "chewing" and having "a white powder and rock like substance on his face" after exiting the "cocaine cloud" inside the car but failing to ensure that he was medically cleared at the hospital; Detective Heath detailing the substantial quantity of cocaine covering the interior of Mr. Royal's vehicle but failing to notify the paramedics; and Detective Franceus knowing that Mr. Royal had ingested cocaine and knowing that Mr. Royal could not be admitted to the jail as a result but nevertheless chaining him to the floor of the interview room with limited monitoring where he convulsed for several minutes unnoticed. Because factual issues remain for trial, the Court denies summary judgment on Plaintiff's request for punitive damages on the § 1983 claim against the five defendant officers.

Defendants also move for summary judgment on any punitive damages sought against Defendant City of Fort Wayne. Plaintiff represents that she is not seeking punitive damages against the City of Fort Wayne and agrees that the City of Fort Wayne cannot be made to pay punitive damages. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Therefore, the Court grants summary judgment in favor of Defendant City of Fort Wayne as to punitive damages.

**B. State Law Claims**

Plaintiff brings an Indiana state law claim against Defendants under the Indiana Wrongful Death Act as well as claims of assault and battery and of false imprisonment. (Compl. ¶¶ 32-35). Plaintiff alleges that the individual officers committed these torts within the scope of their employment and, thus, the City of Fort Wayne is liable under the doctrine of respondeat superior. Defendants move for summary judgment on all of Plaintiff's state law claims.

*1.     Indiana Tort Claims Act*

Defendants argue that the individual defendant officers are entitled to immunity from liability on all of Plaintiff's state law claims under the law enforcement immunity provision of the Indiana Tort Claims Act ("ITCA"), Indiana Code § 34-13-3-3(8). This provision of the ITCA renders police officers immune from liability when acting in the course of their government employment if a loss results from the "adoption and enforcement of or failure to adopt or enforce: (A) a law (including rules and regulations) . . . unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8) (emphasis added). Plaintiff alleges in the Complaint, and Defendants do not dispute, that the defendant officers were acting within the scope of their employment at all relevant times. (Compl. ¶ 6). In response to the motion, Plaintiff argues that Indiana law excludes claims of false imprisonment and assault and battery from immunity under § 34-13-3-3(8).

Indeed, the ITCA provision itself expressly excludes from immunity a claim for false imprisonment. *See* Ind. Code § 34-13-3-3(8). Therefore, the defendant officers are not entitled to immunity on the false imprisonment claim. Nevertheless, as held below in section B.4, summary judgment is granted in favor of the defendant officers on the merits of the false imprisonment claim.

As for the assault and battery claim, the Indiana Supreme Court has held that a claim of assault and battery against a police officer is exempt from immunity under the ITCA. *See Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) (citing *Kemezy v. Peters*, 622 N.E.2d 1296, 1297 (Ind. 1993)). Therefore, the defendant officers are not immune from liability on the assault and battery claim. Nevertheless, as held below in section B.3, summary judgment is granted in favor of the defendant officers on the merits of the assault and battery claim.

Plaintiff does not contest that § 34-13-3-3(8) provides the defendant officers with immunity from liability on the Indiana Wrongful Death Act claim, which is brought based on an alleged failure to provide medical care (and not based on battery or excessive force). Accordingly, the Court grants summary judgment in favor of Defendants Gutierrez, Norris, Bowers, Heath, and Franceus on Plaintiff's claim under the Indiana Wrongful Death Act.

2.    *Indiana Wrongful Death Act*

In paragraphs 32 and 33 of the Complaint, Plaintiff alleges that Defendants caused the unlawful death of Mr. Royal, which is actionable under the Indiana Wrongful Death Act. Indiana's Wrongful Death Act provides for a right to sue by a personal representative of an estate based on a decedent's death "caused by the wrongful act or omission of another." Ind. Code § 34-23-1-1. To prevail on an Indiana Wrongful Death Act claim, Plaintiff must prove "(1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach." *Lane v. Walgreen Co.*, No. 1:12-CV-1180, 2014 WL 2881543, at *7 (S.D. Ind. June 24, 2014) (quoting *Hays v. Bardasian*, 615 F. Supp. 2d 796, 800 (N.D. Ind. 2009)).

With no discussion of the legal elements of the wrongful death claim, Defendants argue that this claim cannot survive because, as they argued in relation to the Fourth Amendment claim, there is no evidence that the officers failed to reasonably respond to Mr. Royal's medical needs when they did not know he had a medical need. However, as set forth above in section A.1 of this Opinion, there are genuine disputes for the jury regarding whether the officers failed to reasonably respond to Mr. Royal's medical needs. Therefore, the Court denies the motion for summary judgment brought on this basis.

Nevertheless, as set forth in the previous section, the defendant officers are immune from suit on this claim under the ITCA, and the Court grants summary judgment in favor of the defendant officers on this claim. In contrast, Plaintiff's claim against the City of Fort Wayne under a theory of respondeat superior survives. An employer can be held vicariously liable for the state law torts of its employees committed in the course and scope of their employment. *Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 106-07 (Ind. Ct. App. 2014), *trans. denied*, 29 N.E.3d 1274 (Ind. 2015). Because the Indiana Wrongful Death Act claims survive summary judgment on the merits and because there is no dispute that the officers were acting in the scope of their employment, Plaintiff can pursue this claim against the City of Fort Wayne. The Court denies the motion for summary judgment on the Indiana Wrongful Death Act claim against the City of Fort Wayne.

3.      *Assault and Battery*

Under Indiana law, a law enforcement officer is permitted to use only "reasonable" force when effectuating an arrest. Ind. Code § 35-41-3-3(b); *see also Wilson*, 929 N.E.2d 200. "If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Wilson*, 929 N.E.2d at 203.

The Complaint itself does not identify any harmful or offensive contact by the officers with Mr. Royal. Nor does the Complaint identify any specific "acts" by the officers done in arresting Mr. Royal that were harmful or offensive or that would constitute excessive force. In the motion, Defendants argue that all of the force used by the defendant officers against Mr. Royal is seen on the in-car camera videos and Sergeant Bowers' body cam video and that none of the force approaches being unnecessary or excessive.

In response, Plaintiff does not assert that any aspect of the arrest provides a basis for the battery claim. Rather, Plaintiff states only, "Concerning battery, Mr. Royal is seen on video suffering offensive touching and great physical distress in the police interrogation room. This is the direct result of the intentional actions of officers." (ECF 32, p. 22). Plaintiff offers no further description of what actions constituted offensive touching in the interview room. A review of the video recording of the police interview room does not show any unnecessary or excessive force. (Def. Ex. I). Detective Franceus touched Mr. Royal in the interview room to assist him once Detective Franceus realized Mr. Royal needed medical attention; this included rolling Mr. Royal onto his side and patting his back. Mr. Royal's physical distress started before Detective Franceus entered the room. Nothing in the video indicates that Detective Franceus' touching of Mr. Royal was the cause of Mr. Royal's physical distress. *See* (Def. Ex. I).

Plaintiff has not offered any facts to show that any of the defendant officers used unnecessary or excessive force, and summary judgment is proper. Because the officers are not liable for the claim of assault and battery, there can be no claim against the City of Fort Wayne based on a theory of respondeat superior. Accordingly, the Court grants summary judgment in favor of Defendants

Gutierrez, Norris, Bowers, Heath, and Franceus as well as Defendant City of Fort Wayne on the state law claim of assault and battery.

## 4. *False Imprisonment*

Under Indiana law, "[t]he tort of false imprisonment occurs when there is an (1) unlawful (2) restraint (3) upon one's freedom of movement or the deprivation of one's liberty (4) without consent." *Donovan v. Hoosier Park, LLC*, 84 N.E.3d 1198, 1207 (Ind. Ct. App. 2017) (citing *Ali v. Alliance Home Health Care, LLC*, 53 N.E.3d 420, 432 (Ind. Ct. App. 2016)). "If a detention is lawful, by definition, it cannot constitute false imprisonment." *Chestnet v. K-Mart Corp.*, 529 N.E.2d 131, 134 (Ind. Ct. App. 1988). Mr. Royal was detained pursuant to his arrest. Under Indiana law, an "arrest" is the "taking of a person into custody, that he may be held to answer for a crime." Ind. Code § 35-33-1-5. A false arrest under Indiana law requires the absence of probable cause. *Garrett v. City of Bloomington*,478 N.E.2d 89, 93 (Ind. 1985). The probable cause determination turns on "whether a reasonable person, under the facts and circumstances encountered by the arresting officer, would believe that the suspect had committed or was committing a criminal offense." *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003).

Defendants argue that all the evidence supports the conclusion that the officers had probable cause to arrest Mr. Royal for driving without a license, resisting arrest, and possession of cocaine. Thus, Defendants argue that, because there was probable cause to arrest Mr. Royal, his detention cannot constitute false imprisonment. In response, Plaintiff does not dispute that there was probable cause to arrest Mr. Royal. Rather, Plaintiff argues, without citation to law, that the officers did not have lawful authority to detain Mr. Royal at the scene of the arrest or in an interview room "when they knew he had a constitutional right to be transported to a hospital prior to confinement." (ECF

32, p. 22). This argument goes to whether Defendants denied Mr. Royal medical treatment and not to whether he was falsely imprisoned.

Plaintiff has not met her burden of identifying facts to support the false imprisonment claim, and summary judgment for the officers is proper. Because there is no claim for false imprisonment against the defendant officers, there can be no claim against the City of Fort Wayne based on respondeat superior. Accordingly, the Court grants summary judgment on Plaintiff's false imprisonment claim in favor of Defendants Gutierrez, Norris, Bowers, Heath, and Franceus as well as Defendant City of Fort Wayne.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Defendants' Motion to Strike 'Plaintiff's Appendix: 1. Local Rule 56-1 Statement of Genuine Issues'[DE 34] and **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment [DE 29].

The Court **GRANTS** summary judgment in favor of (1) the City of Fort Wayne on Plaintiff's § 1983 *Monell* failure-to-train claim, (2) all Defendants on Plaintiff's Fourteenth Amendment familial interference claim and Shondra Royal's § 1983 individual loss of consortium claim, (3) Defendants Gutierrez, Norris, Bowers, Heath, and Franceus on Plaintiff's Indiana state law claims under the Indiana Wrongful Death Act, for assault and battery, and for false imprisonment, (4) the City of Fort Wayne as to punitive damages, and (5) the City of Fort Wayne on Plaintiff's Indiana state law claims for assault and battery and for false imprisonment.

The Court **DENIES** Defendants' request for summary judgment (1) on the § 1983 Fourth Amendment claim for failure to provide medical care against Defendants Gutierrez, Norris, Bowers, Heath, and Franceus, (2) on Plaintiff's request for punitive damages on the § 1983 claim against

Defendants Gutierrez, Norris, Bowers, Heath, and Franceus, and (3) on the Indiana Wrongful Death Act claim against the City of Fort Wayne based on a theory of respondeat superior.

SO ORDERED this 17th day of September, 2018.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT